No. 5818.

JASON T. DIBOLL vs. ÆTNA LIFE-INSURANCE COMPANY OF HARTFORD, CON-
NECTICUT. MRS. NANCY LOTSPEICH, INTERVENOR.

An agent of a life-insurance company is without authority, by giving an antedated receipt for premium, to revive a policy which was forfeited for the non-payment of the premium as stated in the contract:

Held, that the facts of this case did not justify holding the defendant under an agreement to revive an old, or issue a new policy upon the insured proving to be a good risk after satisfactory examination.

Where there is a passive violation of a contract default is necessary.

APPEAL from the Fifth District Court, parish of Orleans.   *Cullom, J.*

*H. N. Ogden* and *John H. Ilsley* for plaintiff and appellee.
*Singleton & Browne* for defendant and appellant.
*D. C. & L. L. Labatt* for intervenor and appellant.

Singleton & Browne, for defendant and appellant, contended : 
It is fully established by the evidence in the record, that the policy

issued by defendant in 1860, on the life of Lotspeich, had lapsed and become forfeited ; and that the terms and conditions upon which defendant, in 1869, agreed to issue a non-participating policy to Copes, the assignee of the forfeited policy, were not fulfilled by him. Defendant is, therefore, in no manner bound.

D. C. Labatt, for intervenor, appellant, contended :

The main issue is, was there or not at the death of Lotspeich a valid subsisting contract with the defendant to insure his life ? It is admitted by defendant that there was a life policy in August, 1860. Its forfeiture has not been shown, and in case of doubt, it is not to be decreed, as forfeitures are not favored in law. 4 Bigelow, Life and Accidents, p. 5 ; 29 Barb. 557 ; 25 Barb. 189 ; 35 N. Y. 131 ; 25 Conn. 542 ; 19 La. 214 ; 6 Wall. 129. Furthermore, it is shown that an agreement to revive the policy was made with defendant and is binding upon it.

The judgment appealed from is correct so far as it decides that defendant is liable for the amount of the policy ; but it should have been in favor of intervenor, and not of plaintiff. 12 Smith, 253 ; 1 Zybriski, 347 ; 1 Big. 315 ; 41 Miss. 538 ; 20 Beaver, 389 ; 3 Big. 559, 702 ; 4 Bigelow, 135, 572 ; 3 Kent, 375 ; 17 N. Y. 427 ; 1 Phil. 77.

H. N. Ogden, for plaintiff, appellee, contended :

A man having insured his life for his own benefit and that of his executors, administrators, and assigns, under circumstances entirely free from the suspicion of intending to obtain a wager policy, can make a valid sale of his rights under that contract for a valuable consideration. Such a policy of insurance is a species of property salable like any other, and is not necessarily lost to the owner when he becomes unable to keep it in existence any longer himself. 3 Simons, 56 ; 20 N. Y. 32 ; 13 N. Y. 31 ; Bliss on Life Insurance ; Bigelow's Life and Accident Insurance Rep. p. 365.

If the policy originally issued by defendant on the life of Lotspeich, and assigned to plaintiff, had lapsed, which is conceded only for argument's sake, the evidence shows clearly it was revived by defendant.

---

The opinion of the court was delivered by

White, J. The plaintiff, claiming as assignee of a policy of insurance issued by the defendant company on the life of Benjamin F. Lotspeich, for the sum of five thousand dollars, sues to recover the amount. The averments are in substance as follows : That Lotspeich was insured on the 10th of August, 1860, through the instrumentality of J. S. Copes, then agent of the defendant here, the policy issued numbering 5398. That the first premium was paid in August, 1860, and that

when the second payment became due, in 1861, it was made to the agent of the company, J. S. Copes, communications then being interrupted with the company; that as soon as they were re-opened, in June, 1862, the agent of the company notified it of the payment which, under frivolous pretexts, it declined to recognize; that the policy having been assigned to petitioner, he continued to pay the premiums regularly as they fell due, to J. S. Copes, agent, who regularly remitted or tendered them to the company; that in 1869 Copes visited the home office of the company, and it was agreed that the company would recognize the risk, provided a certain sum was paid for past-due premiums, and provided the insured was still living and in reasonably good health; that Copes, as petitioner's agent, traced up the insured, found him living in the State of Kentucky in good health, had him examined by a competent physician; that he transmitted this examination to the company, and tendered the agreed-on sum, which was refused; that petitioner did every thing necessary to carry out his portion of the contract up to the time of the death of Lotspeich, in 1872; made the requisite proof of death, and was refused payment. The defendant answered by admitting the issuance of the policy and the payment of the first premium; averred that when the second premium was paid to the agent, in 1861, he was without any authority to receive, the agency having been revoked by the war, which was then flagrant; that when the agent informed them of the receipt of the premium they notified him of his want of authority, and instructed him to return the premium; that despite this fact, he, in 1862, after the revocation of his authority, pretended to receive for account of the company another payment; that in 1869, in order that no imputation of bad faith might rest on it, the corporation agreed to reinstate the policy, if upon proper examination the insured was found to be a good risk, on the payment of all premiums due with interest from the date they became due, which was declined; that then an agreement was formed by which, on the payment of a designated sum and an annual premium, a new non-participating policy was to be used in lieu of the lapsed and participating one, on condition that the insured proved to be a good risk after suitable examination; that not finding the risk satisfactory, it was not taken.

The intervenor is the widow of Lotspeich, and the tutor of her minor children, the issue of her marriage with him. Her claim is, first, that Lotspeich had no authority to assign the policy; second, that neither the first nor second assignee had any insurable interest on the life of her husband. She joins the plaintiff in seeking to enforce the policy, and seeks recognition as owner of its proceeds. We will determine first the liability of the defendant, and if we find a liability, will pass on the controversy between the plaintiff and intervenor.

It is difficult to analyze the pleadings so as to state precisely the issues presented, whether the claim is under the original policy, or upon that policy revived by the agreement of 1869, or on a new policy agreed to be issued in 1869. The claim is of necessity based upon one of the three. We understand the brief of the plaintiff's counsel to rest his case on the question of a contract of revival in 1869; but we do not take this as an admission that no right existed in the plaintiff in 1869, prior to the revival. For this reason, and because we think that the burden of proof largely depends on whether any rights existed in 1869, we will examine the case in its threefold aspect.

The original policy was issued in 1860, the premium was payable on the 10th of August, 1861–62, etc. By the terms of the policy the premium was payable at the home office, and the receipt of the company was rendered necessary. The receipt of 1861, as also that of 1862, is signed only by Copes, agent, and on its face it states that the agent was not in possession of the company's receipt, which was the prerequisite evidence of the right of the agent to receive. Even were this not the case, when the payment of 1861 is claimed to have been made the war was flagrant, and the agency had ceased to exist. N. Y. L. Insurance Company vs. Statham, 93 U. S. 24. Were we even to hold that the agent's authority continued despite the war, the position of plaintiff would not be improved; the receipt of the premium in 1861 was communicated to the company, according to plaintiff's own pleadings, in June, 1862, and the uncontradicted testimony is that the company at once notified him that they considered the agency revoked, and declined to be bound by his acts. Despite this fact, the receipt was given for the premium, as per the receipt of the agent on the 10th of August, 1862, after the express revocation of the agency. There is another view equally fatal. The first receipt, that of 1861, signed by J. S. Copes, agent, purports to have received the premium from B. F. Lotspeich on the 10th of August, 1861. Now, on the policy is an assignment made on the 22d August, 1861, by the assured Lotspeich to the firm of Copes & Phelps, composed, as the record establishes, of J. S. Copes and H. J. Phelps. Copes testifies that the transfer was made on the 22d August, 1861, and his testimony is in accordance with the date of the written assignment; he also pointedly says that at the time of the transfer the premium had not been paid by Lotspeich; in this he contradicts the written receipt signed by himself, which is dated the 10th of August. His testimony as to the premium not having been paid when the policy was transferred is given with great particularity, and was pertinent. Now, if his testimony be correct, the policy had lapsed when the premium was paid or received by him. The premium was due on the 10th of August, the transfer was on the 22d August; if paid after that date, the receipt, which is dated the 10th, must have been antedated.

That an agent of an insurance company cannot become the trans-feree of a lapsed and forfeited policy against the company he represents himself, accept the assignment as agent, and then recover the policy by an antedated receipt for the premium, is self-evident. The same diffi-culty in, if it were possible, a more pronounced form, exists as to the assignment under which the plaintiff holds. It bears date the 4th January, 1862, and the receipt for premium the 10th of August, 1862. Now the consideration of the transfer, as testified to by the plaintiff, was remuneration for his services rendered the partnership while the partners were absent during the war, an absence which commenced after the date of the assignment. Copes himself swears that the assign-ment to Diboll, his son-in-law, was made in consideration of the atten-tion given by him to the business of Copes & Phelps during the ab-sence of the partners. " Until after the close of the war and the return of those partners." Now if this be true, both the assignment to the plaintiff and the receipt of premium from him must have been ante-dated by several years. The only escape would be to disregard as erroneous, or given through mistake, the testimony of the plaintiff, as also that of Copes, and to adhere to the dates found in the writings. But if we did this, the consequence would be the inference that the transfer was without consideration, in other words, unreal, and there-fore that Copes, acting for Copes & Phelps, transferred to plaintiff with-out consideration, then gave, as agent of the company, although his agency had been revoked, his approval to the transfer, and subsequently to the transfer gave a receipt for the premium as agent. Under this state of things, we think the clause under the original policy was evi-dently forfeited, unless revived by subsequent agreement, and that as the new agreement was a new contract, the burden was on the plaintiff to prove it. Without reference to the proof that the original contract once existed, the testimony as to the revival is substantially as follows :

The president of the company testifies that upon representations made by Copes that the payments had been made in good faith, with-out knowing who was the assignee, he offered to revive the policy, con-ditioned on the payment of the arreared premiums, with interest, then amounting to over a thousand dollars, the party to be re-examined and accepted as a satisfactory risk ; that the proposition was not accepted. That thereupon, at the solicitations of Copes, they agreed to issue a new non-participating policy for $5000, Copes to pay $192 for arrearages, instead of the sum above mentioned, the party to be examined and shown to be a good risk. The witness is supported by a written memo-randum of the terms of the agreement made at the time, and is cor-roborated by the testimony of an employee of the company who was present at the agreement, and swears that he made the computation for

the rate of the new policy thus proposed. True, Copes contradicts this testimony, and insists that the old policy was to be reinstated, but while in some points he is positive, in others he is hesitating and uncertain. When pressed to say whether the contract was one for a new policy or the old contract revived, he says: "I think my recollection is that the old policy was to be reinstated; I don't think it was particularly settled which was to be done; but the old policy was to be reinstated or its equivalent." His letter, written at the time, we think, conclusively shows that the agreement was to issue a new policy. The letter is as follows:

"U. S. Hotel, 19th June, 1869.

"T. O. Enders, Esq,

   "Secretary, &c., Ætna Life Ins. Co.:

"Dear Sir—I omitted to say that, as the assignment of the old policy by Mr. Lotspeich was to a mercantile firm, Copes & Phelps, not in existence since the war, I shall be obliged to you if you will make out the new one directly to me. Mr. Phelps has no interest in it."

      "With great respect,

            "Yours truly,

   "(Signed)                                    J. S. COPES."

"P. S.—*I will return you the old policy, of course, on receipt of the new one.*

               "JOSEPH S. COPES."

The fact is, the conviction left on our minds by the testimony is that the company was willing to reinstate the policy upon a re-examination, and payment of arreared premiums; that this was declined, on account of the large sum to be disbursed, and an agreement was entered upon by which the insurance was to be revived and continued upon the non-participating plan. We say revived and continued, for our understanding of the proof is that the premium in the new policy was not to be charged for as if the policy was newly and for the first time issued, but as if originally issued at the date of the first policy on the non-participating plan. This explains the letter of the secretary in which the words revive and continue the insurance are used, reconciles it with the letter of Copes, and harmonizes with the proof in the record. The claim of plaintiff cannot be successful on the original policy, nor on the agreement to revive the original policy, for none such was made. If successful at all, it depends on an agreement to revive and continue the risk by the issuing a new policy. The testimony of Copes is that the agreement was predicated upon the assured being alive and in reasonably good health; that of the officers of the company is that it was upon the condition he was alive and would be considered a good risk, after satisfactory examination by a competent medical examiner. The

burden of proof was on the plaintiff. For this reason, and because of impressions resulting from an examination of the whole of the testimony, as also because we think the proof is that medical examinations are shown to be required by all companies, before either reviving an old and lapsed or issuing a new policy, we think the agreement, as stated by the officers of the company, was the one entered into. The difference, however, is not very wide between a condition of reasonable good health and a good risk. The plaintiff, or rather his agent, Copes, must have understood that the reasonable good health was to be shown by a medical examination, because he proceeded at once to have the person examined by a physician, not an examiner of the company, transmitting his certificate as the evidence of compliance with the condition upon which the new policy was to issue. The proof is that shortly after the agreement, the agent of plaintiff, J. S. Copes, forwarded to the company his draft on a firm of which he was a member for the amount agreed to be paid to obtain the new policy. That he was replied to, that the draft would not be used until the party was shown to be in good health, " as such was the understanding ;" the letter concluding by saying : " I will not send on your draft for collection, but, as I have stated, wait further advices, when, if satisfactory, your wishes about the policy shall be complied with." That Copes then had the person to be insured examined, and transmitted the certificate of examination to the company, who not being satisfied with it declined to issue the policy, and returned the draft. We think the company was authorized to decline the risk upon the showing made by the certificate, 1st, because the certificate was not made on the blank used by the defendant company for the purpose of examining those whom it was to insure ; 2d, because the answers made by the examiner were not explicit and full ; 3d, because one of them declared the person not to be a first, but a *second class* risk ; fourth, because, although the examiner was asked by one of the questions to state whether he recommended the risk, he did not answer the question, thereby giving rise to the legitimate inference that as he had classified the risk as second-class he declined to recommend it. There is testimony showing that insurance companies do not usually regard the classification of risks by medical men into first, second, and third class, but that they more particularly regard the recommendation of the physician as to the advisability of the risk. The agent of the defendant says that it is the rule to decline risks classified as second-class, and that this was the invariable rule for the conduct of its business during the time Copes was the agent. Even if this were disregarded, the very witnesses who swear to the little importance of the classification of risks into classes say that the important consideration is the recommendation of the examiner that the risk be or be not taken.

The examination was certified to on the 30th January, 1870. Now, it must have been transmitted to the company between the day it was made and the 12th of February, 1870, when it is shown the draft was returned to Copes. Lotspeich died on January 25th, 1872, and although nearly two years thus elapsed between the refusal of the company to issue the new policy, on account of the unsatisfactory nature of the proof, and the death, no putting in default, no tender of the necessary proof, nay, not even complaint on the part of the plaintiff is shown. So far as the record discloses, the first intimation that the issue of the policy was considered to have been wrongfully refused was conveyed after the death of the person upon whose life it was to have evidenced a risk. To say now upon parol evidence that the person was in good health, and hence a good risk, would be making a contract for the parties, and substituting our will for theirs. For look as we may at the contract to issue the new policy upon a condition, it can only be considered as an obligation to do. If, in violation of the contract, the thing agreed on was not done, then a specific performance could be invoked, where the performance was possible, which is clearly not the case here, as the party upon whose life the policy was to be issued is dead, and the satisfactory examination which was the condition is no longer possible. Then the plaintiff's remedy is an action in damages for non-compliance; to that default was a prerequisite, the refusal to issue the policy upon the insufficient certificate having been not only not an active but no violation of the agreement. These views dispose likewise of the intervenor's claim against the defendant, and render unnecessary an examination of the issues between the plaintiff and intervenor.

The judgment below is reversed, and judgment be and the same is hereby rendered in favor of the defendant and against the plaintiff and intervenor, with costs in both courts.

Rehearing refused.